1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division




-------------------------------:
                               :
VIRGINIA VOTERS ALLIANCE,       :
INC., et al.,                   :
              Plaintiffs,        :
                               :
     -vs-                       :        Case No. 1:16-cv-394
                               :
                               :
ANNA J. LEIDER,                 :
              Defendant.         :
                               :
-------------------------------:
```

HEARING ON MOTIONS


June 17, 2016


Before:  Leonie M. Brinkema, USDC Judge

<u>APPEARANCES:</u>

J. Christian Adams, Counsel for the Plaintiffs

William W. Tunner, Counsel for the Defendant

N. Thomas Connally, Haley K. Costello Essig, Cameron A. Bell,
and Michelle E. Kanter Cohen, Counsel for the Intervenor

2

```
1              THE CLERK:  Civil action 16-394, Virginia Voters
2   Alliance, Inc., et al., versus Anna J. Leider.  Will counsel
3   please note their appearances for the record.
4              THE COURT:  All right.  For the plaintiff.
5              MR. ADAMS:  Your Honor, Christian Adams for the
6   plaintiff.  With me is Mr. Jeremy Taylor, a Board member of the
7   plaintiff.
8              THE COURT:  All right, good morning.
9              MR. TAYLOR:  Good morning, Your Honor.
10             MR. TUNNER:  Good morning, Your Honor.
11             THE COURT:  Yes.
12             MR. TUNNER:  My name is Billy Tunner, and I'm counsel
13  to Ms. Leider, who is the Registrar.  And she is right here,
14  the Registrar for Alexandria.
15             THE COURT:  All right.
16             MR. TUNNER:  Would you like her up here?  There is a
17  lot of folks.
18             THE COURT:  I don't know if we have -- yes.  I don't
19  know if we have enough chairs, but I think since she is the
20  putative defendant in this case, she should be up here.
21             And I think we also have folks from the League of
22  Women Voters?
23             MR. CONNALLY:  Good morning, Your Honor.  Tom
24  Connally from Hogan Lovells on behalf of the League of Women
25  Voters of Virginia.
```

1        We have with us today Carol Noggle and Maggi Luca

2   from the League's Executive Board.  As well as my co-counsel,

3   Cameron Bell from DEMOS, Michelle Kanter Cohen from Project

4   Vote, and my colleague Haley Costello Essig.

5        THE COURT:  Good morning.

6        MR. CONNALLY:  Good morning.

7        THE COURT:  All right.  Before the Court is the

8   defendant Ms. Leider's motion to dismiss pursuant to Rules

9   12(b)(1) and 12(b)(6), as well as the motion of the League of

10  the Women Voters to intervene.  That latter motion, however, is

11  contingent upon whether Count 1 remains in this lawsuit, as I

12  understand it.

13        So I am going to address the motion to dismiss

14  because that is, I think, the dispositive motion in this case.

15        MR. CONNALLY:  Certainly, Your Honor, we would agree,

16  although we did file a motion in intervene in part to be heard

17  on the motion to dismiss.

18        THE COURT:  All right.  I think that is not

19  inappropriate.  It is a serious issue in terms of the

20  legitimacy of voting registration rolls.  And so, I am going to

21  grant the motion to allow you to intervene.

22        All right.

23        MR. CONNALLY:  Thank you, Your Honor.

24        THE COURT:  All right.  And again, I've read the

25  pleadings.  So I know what is at issue in this case.  And I

4

1    think I want to actually hear, Mr. Adams, from you.  And that

2    is, one of the issues that has been raised in this case, it was

3    raised in the February 9 letter to Mr. George, who is president

4    of the Virginia Voters Alliance, was questions as to exactly

5    what kind of data you all were using to come up with this

6    allegation that the City of Alexandria's voting registration

7    rolls are not accurately kept.

8           And in particular, as you know, she points out that

9    according to the statistics that Alexandria had as of February

10   1, 2016, Alexandria had some -- I am going to just round up the

11   numbers, approximately 79,000 active registered voters.

12          And that in terms of the population of the city, she

13   indicated that the Census Bureau in July of 2014, so about

14   18 months before that particular time period, that reflected

15   that the Alexandria population was approximately 150,000.  And

16   of that number, 123,800, again rounding it up a bit, were over

17   the age of 18.

18          So that would strongly indicate that unlike several

19   of the cases that you cited where there were more people

20   registered than lived in the particular jurisdiction, here it's

21   showing that roughly about 50 percent of the population is

22   registered to vote.  That doesn't have any kind of -- from a

23   statistical standpoint, it doesn't come to close to any of

24   those cases that you've cited to the Court as examples of

25   situations where the registered voter data was so inaccurate.

1          So you need to respond to that.

2          MR. ADAMS:  Thank you, Your Honor.

3          Of course, that's a merits question.  And this court

4     in the Project Vote v. Long case was very careful to not allow

5     merits questions to reach the issue of standing in a motion to

6     dismiss by the defendants in that case.

7          THE COURT:  But we're not just talking standing.

8     We're talking 12(b)(6).  And Iqbal/Twombly has changed the

9     whole nature of civil litigation.  And that is, it doesn't make

10    any difference whether it's a voting rights case, it's Title

11    VII case, a plaintiff still has the obligation before he files

12    a lawsuit or before it files a lawsuit to have done an adequate

13    investigation of the facts as well as the law.  And then to

14    articulate sufficient facts -- facts, not just allegations --

15    to lay out a plausible claim for relief.

16         And I think that's actually the real gist of the

17    defendant's motion.  If you look at not only your complaint,

18    but even the letter that you sent to Alexandria, it's extremely

19    vague.  There is no specificity.

20         MR. ADAMS:  Well, let me address that too.  The

21    number of registered voters versus the eligible citizen

22    population is a fluid number, it changes over time.

23         And for example, if the defendants would prefer that

24    the pleadings say, like it could have, that for the 2014

25    election there was 101 percent of eligible voters registered,

6

1    with 98,311, according to their own statistics which they

2    reported to the Federal Election Assistance Commission, versus

3    97,102, which was the census citizen voting age population in

4    2014, that's 101 percent.

5         Now, the plaintiff could have put that in a pleading,

6    but also included all the other moments in time over the last

7    several years, but that isn't what is required in a Section 8

8    case under the National Voter Registration Act.

9         Based on the cases in the Western District of Texas

10   and the Southern District of Indiana alleging that the

11   defendant over a period of time has had more registered voters

12   than eligible people, according to the Western District at

13   least, creates a strong inference, not just a reasonable one,

14   which is the Twombly standard, but a strong inference there is

15   a violation of Section 8.

16        THE COURT:  I agree with you.  But first of all,

17   those cases are not from this circuit.  But secondly, that's

18   not the type of pleading you have in your case.  You didn't

19   plead it that way.

20        MR. ADAMS:  Well, the pleading at least has the

21   number -- let me rephrase.  The pleading at least has the

22   inference of 100 percent or more because it says there were

23   more registered voters than eligible citizens alive.  And so,

24   that per se is over 100 percent.

25        The pleading doesn't use the numeric 100, but it uses

7

1    the quantity.  The pleading has a quantitative term.  And so,

2    at least, at the very worst, the plaintiff should be permitted

3    to amend the pleading to put in some of the moments in time

4    where the defendant's voter rolls have contained more than

5    100 percent of eligible citizens.

6             THE COURT:  Why were you unwilling to respond to the

7    letter that was sent to you on February 9 in which the City

8    asked you to give them a little bit more -- something more

9    concrete?

10            What was it that you were really concerned about?

11   Because, again, rather than engaging -- unless there was

12   something that is missing from the record, but rather than

13   responding to that, a couple months later you just filed this

14   lawsuit.

15            MR. ADAMS:  Well, the reason is, Your Honor, frankly,

16   because of this court's ruling in Project Vote v. Long in the

17   Fourth Circuit didn't require that.

18            THE COURT:  Just because something is not required

19   doesn't mean that lawyers who are functioning in good faith,

20   who really are trying to get at a serious issue without

21   creating unnecessary litigation costs, don't true sit down and

22   engage -- I mean, this was a very, it seems to me, a very

23   clear, straightforward letter, an effort by the defendant to

24   explain to you what the situation was, and asking you is there

25   something more that you want.

8

1        And rather than saying, yeah, you didn't give us X,

2  Y, and Z, you didn't tell us about, you know, how many felons

3  on are on the list or not on the list or whatever, you just

4  filed a lawsuit four months later.

5        MR. ADAMS:  Well, this court in <u>Project Vote</u> in

6  footnote 6 specifically said that the motivation for seeking

7  the information under the public records provision was

8  irrelevant.

9        And so, we could walk out of this courtroom, I

10  believe, and work this case out.  We could review the records,

11  but there is no ticket for admission that a requester must give

12  to an election official to inspect those records.

13        THE COURT:  That may be true, but there is basically

14  an admission ticket to this court.  And that is, these days

15  under <u>Iqbal</u>/<u>Twombly</u> a plaintiff can't just come in and say

16  general allegations of, you have failed to do this, you have

17  failed to do that.  You have got to put some specific meat on

18  the bones, and this complaint clearly dues not have that.

19        MR. ADAMS:  Well, Your Honor, the defendants deny the

20  records.  If you look at their letter, they say, once we

21  receive information, we'll be willing to meet you.  They didn't

22  say, we will give you the information requested.  They said,

23  we'll talk.  That's very different.

24        They also said, was there a particular chart that

25  supports your claims?  That goes straight to the footnote in

1   Project Vote in footnote 6 that a requester need not get into

2   why they're requesting the information.

3           So we simply followed the guidance of this court in

4   sending the letter.

5           Now, like I said, we're happy to work this out and

6   review the records, we could do that next week.

7           THE COURT:  All right.  Let me hear from the defense.

8           Now, is there a problem, if anybody from the public

9   wants to see the records, with them seeing the records?

10          MR. TUNNER:  There is not, Your Honor.  Any member of

11  the public can make -- doesn't even need to schedule an

12  appointment.  Ms. Leider will tell you right now, and we had

13  this conversation before we entered the courtroom this morning,

14  it's open to public.  Anyone can come at any time and inspect

15  these records.  She in fact has a conference room set up with

16  all of these records always available for the public.

17          THE COURT:  And Mr. Adams, of course, represents --

18  he could go in this afternoon and say, I would like to see your

19  records?

20          MR. TUNNER:  We could leave the courtroom in

21  90 seconds and he could be there in ten minutes and look at

22  them.

23          THE COURT:  Now, just so I know because I've never

24  done this, tell me what records he would get to see.

25          MR. TUNNER:  That's a question that, if I may --

10

1          THE COURT:  Would you like --

2          MR. TUNNER:  Can I have my client answer that

3     question?

4          THE COURT:  Yes, ma'am, if you would go up to the

5     lectern, please.

6          And is it Leider or Leider?

7          MS. LEIDER:  Leider.

8          THE COURT:  Ms. Leider.

9          MR. LEIDER:  We have a lot of records in our office.

10    But a couple items that we keep available for public inspection

11    at any time is a book with the names of everyone who received a

12    notification that we were trying to confirm their address.

13         Once a year the State Department of Elections does a

14    big mailing to anyone who we've received kind of information

15    that an address confirmation has been requested.  And it's

16    thousands and thousands of names, I think there are about 8,000

17    names a year.  And there is a book every year that we keep

18    available for inspection that anyone can come in and look and

19    see who received the address confirmation letter.  It has both

20    their registration address in Alexandria as well as the address

21    where they may now be living based on U.S. Postal Service

22    confirmations, a variety of other sources.

23         We also have, after every federal election, there is

24    a purge process that happens for voters who were placed on an

25    inactive list and don't vote in two federal elections, they are

11

1  purged automatically.  And we keep binders with the names of

2  all those, all of those voters.

3          The names are also kept at the courthouse.  So if

4  someone didn't want to come to our office, they could go to the

5  Alexandria courthouse and view them there.

6          Then we also have -- there is a variety of data that

7  can be generated from the statewide voter registration

8  database.  So if they wanted lists of people who were purged

9  for death, or felony, or moving out of state, or mental

10  incapacitation, or any of the other categories, that we would

11  have to generate on the spot, but it is just a matter of

12  entering a date range and saying, generate a report.  And it

13  would print out.

14          So some things are available for public inspection by

15  anyone who comes in, and other reports could be generated very

16  quickly.  And we do that for anyone who comes into the office

17  and asks to see things.

18          THE COURT:  So in some respects, that might have been

19  the better letter to have sent to Mr. George.  Just to say, Mr.

20  George, the office is open from 9 to 5 and you can come in and

21  here is what you can get.  All right.

22          MR. TUNNER:  Your Honor, my client, she is the

23  Registrar, she is not an attorney.  She didn't have counsel to

24  advise her on how best to write the letter.  But I think if you

25  read the letter, it's a very polite letter.  And it gives --

12

1   you know, the plaintiff had asked for specific information, and

2   she responded giving Census Bureau data, giving Weldon Cooper

3   Center data, and giving the exact number of active registered

4   voters from eight days prior.

5            She gave them all information that they could have

6   wanted to do a basic analysis on their premise, which is are

7   there more people who are registered to vote than there are

8   legally entitled to vote.

9            Then she concludes saying, you know, I don't really

10  understand your position, please help me.  And it is

11  essentially, help me help you.

12           And the way I read this -- oh, and she concludes by

13  saying, once I receive the information, we are more than

14  willing to meet with your representatives.

15           She sends a follow-up -- she sends an e-mail, once we

16  receive a bit more information about the source of your

17  concerns, we're pleased to discuss them with you.  Transparency

18  always serves the electoral system well.  She is not hiding

19  anything.

20           And the way I see this, Your Honor, it is a bit like

21  a meet and confer requirement, the notice requirement under

22  this statute.  She was never on notice prior to this lawsuit

23  that there was a problem with her letter.  The notice they sent

24  said, we think you have too many people registered to vote.  It

25  didn't -- they never followed up saying, you breached the Act

13

1   by not giving us the information.  And all it would have taken

2   was a text, a phone call, or any communication.

3           And as you can tell, she is very interested in

4   complying with the Act and doing a good job.

5           I think that under Iqbal/Twombly though, this lawsuit

6   should cease.  And we could go -- we could follow up and go

7   have a meeting that anyone in the public, including Mr.

8   Norcross and those associated with him, want to have.

9           THE COURT:  All right.  Does the League Of Women

10  Voters want to be heard on this?

11          MR. CONNALLY:  I would like to be -- Your Honor, Tom

12  Connally.  I would certainly like to be heard, but I do have a

13  rule that if I'm winning, I should probably be quiet.  So if

14  the Court is inclined to dismiss Count 1, which is the count in

15  which we're interested in on Twombly and Iqbal grounds, I won't

16  address the Court.  But I can make a few brief points.

17          THE COURT:  Why don't you just make a couple of brief

18  points, yeah.

19          MR. CONNALLY:  Certainly, Your Honor.  So as we have

20  said in our papers, the plaintiffs are seeking to turn in Count

21  1, which is the count we're addressing purely on 12(b)(6)

22  grounds, we're not addressing standing or the public records

23  claim, but in Count 1 in seeking requested relief, the

24  plaintiffs are seeking to turn the NVRA on its head.  They are

25  using it as a vehicle to compel removal of names from the

14

1  voting rolls instead of keeping them on the voting rolls, which

2  the intent of the statute.

3          So there is just no basis for any relief under the

4  NVRA for the Court to order the Registrar to do anything.  The

5  statute merely requires the state to conduct a general program

6  that makes a reasonable effort to remove from the official

7  lists voters ineligible by reason of death or change in

8  residence.

9          And plainly by state statute, the Commonwealth does

10 that.  And indeed, the state program relies on the Postal

11 Service's national change of address database which the NVRA

12 says is expressly sufficient.

13         So there is no factual allegation of any kind of

14 noncompliance with the NVRA by the Registrar or anyone else.

15         So as Mr. Tunner has well argued, and as the Court

16 has noted, the allegations here are entirely conclusory and

17 devoid of any specific facts from which the Court could draw a

18 conclusion that there has been any noncompliance with the NVRA.

19         Secondly, the NVRA sets up process requirements.

20 It's restrictions on how, when, and for what reasons voters can

21 be removed from the voting rolls.  The NVRA does not require

22 any specific result.

23         So you can't point just to the alleged result of that

24 statutory list maintenance process as a basis for challenging

25 it.  You have to identify some specific act or omission that

15

1    allegedly violates the NVRA.  And there isn't any here.

2         And last, and I think this is an important point, you

3    know, the NVRA is specifically designed to restrict and slow

4    down the removal of voters from the rolls to ensure that

5    eligible voters don't improperly loose their registration and

6    their ability to vote, particularly right in advance of an

7    election.

8         So under the NVRA, when a registrant moves away from

9    Alexandria, unless that registrant either specifically requests

10   to be removed from the rolls or responds to a written notice

11   from the Registrar confirming that they no longer reside in

12   Alexandria, the registrant under the statute, under the NVRA,

13   cannot be removed from the official voting lists for two

14   federal general elections after the date of the statutory

15   notice.

16        So that's a period of anywhere from two to four years

17   after the notice is sent that a voter who has moved away is

18   going to remain on the Alexandria rolls.

19        And then there is the 90-day period before any

20   election in which no voters systematically should be removed

21   from the voting roll list.

22        So under the NVRA, it's expected that there is going

23   to be many registrants who have in fact moved away from

24   Alexandria yet remain on Alexandria's voting list for years,

25   for years.

16

1        So given the registration protection provisions in

2    the NVRA and in a jurisdiction with high voter participation

3    and a transient population like Alexandria, it's entirely

4    plausible that the number of registrants could exceed the

5    number of eligible -- of the eligible voting population.

6            Now the Registrar has made --

7            THE COURT:  But if --

8            MR. CONNALLY:  Here in --

9            THE COURT:  Wait.  But in this particular case,

10   unlike the cases which the plaintiff cited -- as I recall,

11   every case the plaintiff cited where there were statistics,

12   clearly showed -- I mean, you could be have sixth-grade

13   education and you could see, there is something wrong here, it

14   would appear to be, because there are more people registered to

15   vote that are actually populating that particular jurisdiction.

16           But we don't have anything close to that in case.

17           MR. CONNALLY:  I totally agree, Your Honor.

18           THE COURT:  And so, that's why this case, in my view,

19   is so totally different from the cases the plaintiff cites.

20           MR. CONNALLY:  I think that's exactly right, Your

21   Honor, and is certainly the central basis for dismissal here.

22           I just want to point out that given the way the NVRA

23   works, that I don't think you can necessarily make the leap --

24           THE COURT:  I understand.

25           MR. CONNALLY:  -- from the fact that it's more than

17

1    100 percent, which is not the case here, that's not the case

2    here, that you can necessarily infer a violation of the NVRA.

3    It's a process-based statute.  You would have to point to some

4    act of noncompliance, not simply some alleged statistical

5    evidence, certainly not the vague evidence here.

6              THE COURT:  However the statistical evidence would be

7    enough at the motion to dismiss stage, and that's why most of

8    the -- that's why the plaintiff was citing to those cases, it's

9    enough smoke, there that's enough to allow a court to say, all

10   right, plaintiff, now you can get discovery because there then

11   may be systematic violations of the statute.  But again, that's

12   not this case from what --

13             MR. CONNALLY:  I totally agree, Your Honor.  And

14   respectfully, it would depend on how much smoke there was.  But

15   that's the point we wanted to make.

16             THE COURT:  All right.

17             MR. CONNALLY:  Thank you for your indulgence.

18             THE COURT:  All right.  Mr. Adams, did you want to

19   respond?

20             MR. ADAMS:  Yes, Your Honor.  Proposed intervenor is

21   squarely wrong, that the NVRA does not contemplate a list voter

22   removal or list maintenance provision.  There are four reasons

23   why that is.  First of all, this court in the Fourth Circuit

24   disagreed.  In footnote 14 of Project Vote v. Long, this court

25   addressed this squarely as it relates to the dual purposes of

18

1   the NVRA.

2          Number two.  Proposed intervenor completely ignores

3   legislative purpose number 3 and 4 which is expressly in the

4   statute.  The purposes of this law are to have clean and

5   accurate voter rolls.

6          Number three.  The proposed intervenor ignores

7   entirely all authority on this point that the statute has a

8   dual purpose.  Namely the Western District of Texas, Southern

9   District of Indiana, and not a case cited by either party is

10  U.S. v. Missouri, which is an Eighth Circuit case.

11         I would quibble a bit that there is no allegation

12  about quantity in the rolls.  As I said earlier, it's a fluid

13  number.  But for the 2014 election, for the 2014, the last

14  federal election, the City of Alexandria had 101 percent.

15         Now, they have some statistical errors in their

16  analysis, Your Honor.  Firstly, they include noncitizens in

17  their ratio that they've given this Court.  That's an error,

18  you can't do that.

19         They've also eliminated inactive voters.  An inactive

20  voter can walk into the poles and vote on election day.  So

21  they are the same as an active voter for the purposes of

22  analyzing of who is on the rolls.

23         When you do those two things -- and again, the

24  complaint could be amended to include a range of different

25  dates that include more people on the rolls than people alive.

19

1  They had 101 percent for the 2014 federal election.  The

2  complaint captures that by saying, at different times there

3  were more people on the rolls than people alive.  That it

4  doesn't include a number should not be fatal to the complaint.

5          THE COURT:  All right.  Well, I disagree with you.

6  Again, in the age of Iqbal/Twombly, but also based upon what

7  has been represented by Mr. Adams, the doors of Ms. Leider's

8  office are open, you can go down there and look at the data.

9          And so, what I'm going to do is I'm granting the

10  motion to dismiss on the 12(b)(6) grounds, that this complaint

11  as to either count is not adequately pled with the degree of

12  specificity which I believe is required.

13          And number two, I will give the plaintiff leave to

14  file an amended complaint with this proviso.  That I expect

15  that the plaintiff will first of all have conducted an

16  appropriate prefiling investigation, which would include going

17  down and looking at the records.

18          I mean, if there is in fact a defect, a serious

19  defect that warrants judicial attention, then the plaintiff can

20  certainly refile an amended complaint.

21          However, to just go back to the office and do it

22  without having taken up the defendants at their invitation to

23  go and look at the records, will be potentially sanctionable

24  because if a new complaint is filed and it is again dismissed,

25  I think at that point under Rule 11 the plaintiff might be

20

1  looking at some potential sanctions because we don't want to

2  waste the Court's time or public officials' time in responding

3  to a lawsuit which really doesn't have any basis.

4         But the issue about the integrity of our voting

5  process is very important to everybody.  We want to make sure

6  that those issues are carefully and fully policed.

7         So anyway, that's my ruling.  So the motion is

8  granted on 12(b)(6) grounds.  That moots really -- I have

9  allowed the League of Women Voters to intervene, but at this

10 point now that resolves that issue.  All right.

11        MR. TUNNER:  Thank you, Judge.

12        MR. ADAMS:  Thank you, Your Honor.

13        MR. CONNALLY:  Thank you, Your Honor.

14 ------------------------------------------------
                   HEARING CONCLUDED

15

16

17

18

19

20        I certify that the foregoing is a true and

21    accurate transcription of my stenographic notes.

22

23
                  /s/  Norman B. Linnell
24            Norman B. Linnell, RPR, CM, VCE, FCRR

25